Case No. 20-1009 et al. American Security Programs, Inc. Petitioner v. National Labor Relations Board. Mr. Dowd for the petitioner, Mr. Hickson for the respondent. Mr. Dowd, good morning. Please proceed. Good morning. May it please the Court, my name is Tom Dowd and I represent Petitioner American Security Programs, Inc., who I'm going to refer to hereafter as ASP. ASP has petitioned this Court to review a decision and order that was issued by the National Labor Relations Board. The Board's decision held that ASP violated the National Labor Relations Act by implementing its final offer in the absence of a valid impasse in bargaining. ASP contends that this finding is not supported by substantial evidence on the record. ASP also contends that the Board has failed to act in a manner that is consistent with its own precedent decisions on certain important points of law, particularly regarding lawful bargaining tactics. ASP is a federal contractor, and that status as a federal contractor is what really distinguishes the present case from the many refusal to bargain cases that I know this Court routinely sees and reviews. Those cases generally involve situations where an employer has been accused of trying to avoid reaching an agreement or where the employer is trying to keep the wage rates as low as he can in order to generate greater profit for operating its business. As a federal contractor, ASP wants to get collective bargaining agreements in place, and all the steps that it was taking in connection with this case were lawful steps designed to put pressure on the union to reach a contract, not to either avoid a contract or keep the cost of the contract down. Because whatever wage rates are agreed to, as long as they are approved by the federal government, ASP passes them through. The challenge for ASP is trying to keep those rates at ones that will be approved, because if they're not approved, ASP is contractually obligated to pay the rates, even if it doesn't get approval from the government to reimburse those rates. I understand all of that, but my understanding of the record is that that point was really not a matter of any significant discussion during negotiations. Indeed, you hid some information, and I'm not questioning your integrity or your client's integrity. I'm not doubting or suggesting they should have done otherwise one way or the other, but you hid some information with regard to renewal of the contract. You certainly didn't make the union aware of it, so the point you're making now was really not in play. You were not saying, look, here's the posture we're in as a federal contractor, and there's some urgency because of that. Quite the contrary. Well, I would disagree that they didn't. I was not involved in negotiations in this matter. I'm not blaming anybody. My point, I appreciate that. All right. I would disagree with two characterizations. Number one, they absolutely made it clear throughout the negotiation process, according to the record, that there were these dates that were going to be coming up, and they needed to have contracts in place by those dates. Because if a date runs by, like here we had a date of December 1st where a contract was going into place, and the Federal Protective Service needs 10 days in advance of that date to get the contract. Because if you miss the date, and you enter into a contract a week, two weeks, one month, two months after, you're fine. You've got your contract. But they won't reimburse under it until the end of that year. I totally understand that, but I must say it was certainly not a highlighted point. And if all of this was so important, why did they hide the information about the renewal when it happened? Well, two things. I think you'll find that their communications did consistently keep telling the union, look, these dates are coming up, and we are going to go down if we don't. I know what you're talking about, and we may be reading the record a little bit differently, but still, why hide the information if this is all so terribly important? Why did they hide that information? I think the only information that they can actually be characterized as hiding is the fact that they're in the extension agreement. Yeah, the extension agreement. Extension agreement, which if you hide something, it's as if you have an obligation. The extension agreement. No, I'm not. That's why I don't want you to go down that path. I'm not accusing you and saying whether you were obliged or not obliged. I did lots of labor negotiations. I'm not suggesting you were obliged as a matter of law. But it is curious that you would make your opening argument when you're sitting on a record in which your client did not reveal information about the point you start out with. That is the posture of the relationship between your client and the federal government. It was hidden. It was hidden. I'm not saying someone intentionally meant it. It was hidden. I don't dispute that they did not proactively disclose. Right. This information. All right. So I don't know what's important. Point just isn't weighty to me, then, given that given that point. And then I'll tell you the other thing, just so you understand. You got to understand this is a case in which the board is a great difference. So you got that one problem that I look at. The other problem is when you're wondering whether or not an impasse is reached late in the ballgame at a point you're now saying we're getting really too close. The employer changed the offer that was on the table. Let me address both points because I don't want to walk away from the first one because I do think it's important. Okay. As to whether they didn't they declined to provide this information. No, they just didn't think. Okay. They just did not. Okay. But my point is they don't have a legal obligation. Totally agree. And it is extremely important that they don't have that legal obligation. It was what they determined. And right. Right or wrong. They determined that they believe they could better get an agreement by not disclosing to the union that there was another six months or four months after the December 1st date. Totally. I totally get it. And the problem is I don't understand you're starting your opening argument. You put it right in that you put it right in that category. But in any event, I hear you. We're going past each other now. Okay. Your opening argument raised something that caused me to think about what would have been withheld. So your opening argument made no sense to me. The other thing is late in the ballgame, as you're getting to a point where the employer would want to claim an impasse, the employer switches the bargain or the offered bargain. Importantly. Yeah, I think what's important there with respect to that separate issue is that there's a distinction between the manner in which a proposal is implemented and the more preliminary question of whether an impasse has existed at the time of this offer being implemented. So I think we've met our burden of proof with respect to the fact that there was an actual impasse. I mean, the union made a series of wage proposals that always went up and ended at a proposal that was, you know, 58% above the over three year contract over the amount that the FPS was not going to approve. And so you have to make sure you get get those things. And so, and they were trying to press, they were consistently asking for mediation. But all right, so I have that picture in my head. Go ahead. Now, what's the next point? I'm not sure how you're having established that there's the impasse. There is a question. Oh, no, I'm not buying that. There isn't. There's a question as to whether there's an impasse. Of course, you can't say there's an impasse. The parties were still negotiating. And then the employer switched the bargain or proposed bargain very late in the game. But the parties had definitely reached an impasse on the evidence in the record that on wages that they weren't going. The union was not going to drop down unless the party company agreed to mediate and it had no legal obligation to mediate that. I don't think there's a dispute about as a matter of law. No, no, there's no legal. That's absolutely true. But what we're trying to figure out is what were the parties thinking as they were doing all of these things? The union was not suggesting we're done if they are saying we'd like to have a third party come in and assist us in these negotiations. The company doesn't appear to be saying it's done. If very late in the ballgame, they're coming in and saying, oh, incidentally, you know, what we have been proposing is change. We want to take some things off the table. That would be, for me, clear evidence there is no impasse because now the union has to think about that. I would respectfully disagree with the idea that the union was saying that they had flexibility and room to move. The only way they were going to move was if they if we agreed to mediate. And since there was no legal obligation to mediate, they weren't going to move. They characterized it as a stalemate. They characterize as an impasse. And I realize that doesn't necessarily mean that they legally are saying it is that they have the knowledge of it. But it certainly shows how they thought and what they believed. They were not going to make any additional. Well, you're not you're not. I hear your answers, but you're avoiding the question that I'm raising. I don't know how you can say the employer thought he was at impasse. The employer came in with a new bargain. Well, all that happened. I hear what you're saying. The the the ASP. Obviously, the the template that they used to give the union the final offer was wrong. And they have said so. There's no issue about that. But it is not a case that ASP went up to the union and say, hey, listen, we plan to roll back all the things we've already agreed to and we want to have a whole new set of things. They simply made a mistake in the manner in which it was being put forward. They never stated that they intended to roll it back. The union never raised any concerns contemporaneously about the alleged omissions of these non-economic items. The union said specifically, we're upset that you haven't agreed to our proposal on wages. There's no substantial evidence that they actually changed the terms and didn't put into effect the non-economic items. The board's decision doesn't spend a whole lot of substantial time discussing that issue because it has to do more with how you implement. I suppose that the board's order could be adjusted to say that, yes, you lawfully implemented the wage portions. But there were certain aspects of the non-economic proposals that you failed to put in properly because the way you did it. And I think as I'm reading the board's decision, they're simply looking to try and understand the party's positions at the moment. The employer said you already passed. One of the facts they point to is the employer came in. First of all, there weren't that many sessions, they say. And then they also said the employer very late in the game came in and changed the proposed bargain. That's all information the board is weighing with respect to the substantial evidence question. I hear you. I see my time on direct is expired. Let me ask you a couple of questions. I think you have a lot of facts in your favor, and I'm not terribly moved by the rationale about emailing and decelerating. But let me focus on what I think are some tough facts for you. So one is Judge Edwards talked about the deadlines. As I read the record, it's actually a little bit worse for you to the extent that at one point, your client seemed to affirmatively misstate to the union. The situation about the deadlines by saying that the government was required would require wages to go down to prevailing level as of December 1st, unless you had a new collective bargaining agreement in place. And that's false in two respects. One, this wasn't coming from the government and two, in any event, they had the extension at least through March. Why isn't that at least a pretty significant fact tending to show some degree of bad faith. Two reasons. I mean, one, I think it's an inartful statement to say FPS has reiterated the need for because I think it's accurate to FPS had not reiterated it was really the company that was reiterating it. But the real point is that if if you're right, that that statement was factually incorrect. That is no different than what happens routinely in the bargaining process. If you if a company says, look, we're not willing to include a signing bonus to ensure ratification of this agreement. And then the company ultimately does agree to that signing bonus the state, they may have made the statement they weren't willing to at a time when they were in fact willing to. And it's not true. Similarly, a company could say, we are offering you better wages than what our competitors pay. And if you say that at the bargaining table, it may be wrong, but the union has the obligation to to to show that that's a wrong statement. I understand. I understand the general point if you say this is my last best offer and it turns out, guess what, it really wasn't. But when you say here is a constraint imposed on us by the government, and it really wasn't imposed by the government, that seems a little bit different. We're talking about we're talking about a process rule here where there's an obligation of good faith and you don't have to reach a result, but you do have to you do have to be fair to the other side in the process. Well, remember that the constraint that you're talking about is really the contract starting December 1st and the opportunity that ASP had to pay for a few more months at the higher rates. But even if in February or January before that extension expired, we had agreed to a contract with the union for particular rates, as soon as it got to be March 30th, everything was dropping the wage determination period. So I don't I don't know if it was really that inaccurate. It just was inartful. I really do believe that. But thank you. I will stop right now. And how about another idea that runs through the concept of good faith is you don't necessarily have to take a particular position, but you have to have reasons for the positions that you take, and you have to communicate those to the other side. Mediation. You're not legally obligated to mediate, but you never even responded to four approaches on that score. And with regard to the core economic bargaining, it seems like the union had some decent rationales for their positions. They said we hadn't gotten a raise for a long time in the past, and we're just asking for what people in other buildings are getting. And there's really not much evidence that the company had a reasoned response to those points. I think the comparison is when you say that the union had made these requests, there was a, if you were a company and you have a contract with the union and mid contract, the union comes in and says, we want to pay you a dollar more. We want you to pay us a dollar more. And the company ignores it. Now a good company should say, we don't have an obligation to, and so we're not going to. But the company instead just ignores it. It's not an unfair labor practice for the company not to respond to that. Everything that we're talking about here are, I don't dispute these are hard bargaining tactics, but they're lawful. They really are lawful. The hypothetical you just gave was middle, you're in the middle of a contract. That's the hypothetical you're using, not the bargaining for a new contract. That's entirely different. An employer who's in the middle of a contract with, and there's no bargaining to get a new agreement because the time has arrived. Of course, an employer would told the union to go fly a kite if they came in and said, oh, you know, it would be nice to have a raise, even though the contract doesn't, that's not a good example. Well, the point I'm trying to make is that you can ignore when you don't have a legal obligation to respond. Well, you do when you're in the middle of collective bargaining, that's different as opposed to being in the middle of a contract where there is no duty to bargain. You are bargaining for a new contract. You have legal obligations. It's completely different from when there is no legal obligation to bargain. I don't think there's any board precedent that asserts that. The board precedent instead says that it's a permissive subject to bargaining, not a mandatory subject to bargaining, and I think that's the difference. Wait, what is a permissive subject of bargaining? Mediation is a completely permissive subject. You're misunderstanding our question. Okay, I'm not going to pursue it. Of course, mediation is not mandatory. What we're looking for here is, if you look at the board cases, and this is why we give them deference, the board's trying to find out on the record whether there's information indicating that both sides were at an end. And what the board did here was say, taking the evidence as a whole, we can't reach that conclusion, that they had reached an end. And there was still more to be done, and my colleague and I have been posing questions that cause us to wonder whether the board's right or wrong on that legal inquiry, given certain circumstances here, given you withheld information, given there weren't very many sessions, given that you changed the bargain. I mean, those are all things the board looks at and says, no, we're not prepared to conclude that more bargaining wasn't necessary before someone could say, we're done. We've done all we can do, and that's it. And at that point, the employer can say, we're done. The board said, not yet. Well, my point, and I think this is the last thing I'll say, is that there was unquestionably an impasse on the wages. There was no break that was going to happen until the company agreed to mediation, which it didn't have an obligation to do. And what the company was trying to do, as every employer tries to do in these cases when it wants to get a contract, is the company tried to break that impasse. And the steps that it took to break that impasse, we believe, were lawful steps. Well, the thing that you politely or interestingly, I was really curious to how you were going to characterize it, having done many of these bargains. The late change in the proposal is huge. That, for me, ended it when I ran this record. There could not be an impasse. If you make a late change in the bargain, the other side now has reason to believe there's more to talk about. If you've done it as much as I did it, that is a clear signal to the other side, I'm coming in with a changed proposal. That means there are more things to talk about. You're not close to an impasse at that point. Now, you characterized it as a mistake and this and that. I found that very amusing, given my experience. It's not a mistake. It's evidence of no impasse. And that's what the board was looking at. You changed the proposed deal and you tried to brush it off and you were trying not to smile. It's a horrible mistake if you're trying to argue for impasse. You cannot say you're at impasse if you are coming in that late in the game, hiding information with respect to what's going on with the feds, whether you have to tell them or not, and you changed the proposal. You're not at impasse. All right. My time has expired and I think I've made an effort to address that argument. I'm prepared to readdress it, but I don't want to take time. Just one last question on that. That last best and final offer, which changed a bunch of terms, were any of those... I thought all of the changes made the offer more favorable to the employer. It did. No, I think it was a variety of different provisions, some better, some worse. It simply was the wrong template to use. It wasn't the one that the parties have been having. It was the wrong one to bring forward. It wasn't an effort. There was no discussion with the union of, hey, we're putting a whole bunch of new issues out here. The company obviously thought the only thing they were doing was putting into place wages that were different. If it's a some better, some worse proposal, I'm with Judge Edwards. I had thought it was just completely better for the company proposal, which is to me, if that's what it was, then to me it would be not a sign that the impasse might be thawing, but that you're clearly at impasse and you're starting to play hardball on implementing a post-impasse offer. That's the way I see the regressive offer that the company made. I don't think the record indicates that it was an effort to change all those items. The only thing it was trying to change was the position on wages, but I understand the point you're making. Okay. All right. If there are no more questions, we'll give you a couple minutes and reply. Mr. Hickson. Good morning. May it please the court, Michael Hickson for the NLRB, seeking full enforcement of the board's order. This court has consistently recognized that the existence of a valid bargaining impasse is an affirmative defense and that the board deserves special deference in determining whether a party has carried its burden of proving that defense. Here, ample evidence in the record supports the board's determination that the company simply failed to carry its burden of proving that there was a valid impasse on November 28, 2017. Mr. Hickson, if I can ask you to follow up on the questions that I think all three of us were asking at the end, and that is this last offer by the company to go back to the even lower wages, why wouldn't that cause the union to say, if we weren't at impasse before, we sure as heck are now? Your Honor, I think that the board case law is that when a company, when a party makes a last minute dramatic change in its bargaining proposals, that the bargaining process requires more time for the parties to fully explore whether there is a path to an agreement. And the company here at the 11th hour replaced its previously proposed increases to wage and benefits with wage and benefit cuts. But then on top of that, it introduced a raft of brand new non-economic proposals into the negotiations at the 11th hour. All of which were better for the company. Your Honor, frankly, I'm not positive about that, Your Honor. I know there are a number of non-economic proposals, you know, gear up and gear down time, paid breaks, temporary employees, full-time employee status, a number of others. I know that some of them were worse for the union. I'm frankly not sure, but the point I think, Your Honor, is even if they were all worse for the employees and better for the company, that would only underscore the need for further bargaining because the company- I would see a possibility of maybe I can get the wages up now because they're suggesting if I agree to take away some of those non-economic things, which they've now proposed to take away, I may have a way now to get the wages up. That's why it's inconceivable to me that there's an impasse. So I don't see everything bad as being evidence that it must be impasse. I see it- I'm not sure what the board said about this, but I would see that as an opportunity for the union to say, aha, they're giving us an opening to give back these non-economic matters and maybe we can bump the wages up now. That's the bargain that we got to work on now. Right. Absolutely, Judge Edwards. I agree with that perspective. I mean, the company injects these non-economic proposals into the negotiations at the last minute and then they proceed to unilateral implementation without any meeting with the union, without so much as discussing with the union these brand new non-economic proposals. And now if I remember, remind me if I'm right, I think the board was essentially saying that now everything's on the table, which militates against an impasse finding. That's absolutely right, Your Honor. For example, there's one point in the board decision where the judge says that if anything, the piling on of a host of non-economic topics into the negotiations at the last minute presented the party with a brand new platter of options. So the union with these brand new proposals presented to it, if the parties then, it was necessary to exhaust the collective bargaining process for the parties to explore avenues of agreeing on those proposals because there had been no discussion of them. And they could have made avenues to agreement amongst the non-economic proposals themselves. And they also could have discussed tradeoffs between the non-economic proposals and the economic proposals. And I would add, you know, for example, there's, when we cite cases in our brief that say that this is a commonplace, very common method of compromise in collective bargaining is tradeoffs and deals between economic and non-economic. And I'd like to address the point. Oh, sorry. So let's just, just help, help me think about this. I have less experience than Judge Edwards in this area, but a somewhat different instinct. So let's assume just to simplify this, that they're bargaining over three different issues and they're sort of, the employer is roughly at $26 on wages, $6 on health contribution, and an hour a day on break time. And then at the last minute, they come in with a dramatically new offer, which says $20 on wages, $4 on health, and 10 minutes on break time. You think that's, that could tend to break an impasse because the union will say, oh, this signals flexibility because maybe we can trade X for Y, or you think they're more likely to say, this is, this is crazy. This is much worse. They're, they're, they're moving backwards. So if we weren't done before, we must be done now. Your Honor, if I could, I'd try to make a couple of points to respond. The first is that, well, I guess the first is that there, it's really not a question of whether an impasse was broken. Exactly. That's your answer. The assumption that my colleague is making is that, does this break an impasse? It wasn't an impasse. It's proving that there is no impasse. That's right, Your Honor. And not only that, as we point out in our brief, the company before the board expressly conceded that if there had been an impasse in September, which it had contended, the company expressly conceded, as we point out in our brief to the court, that if there was an impasse in September, that that impasse was broken well, well in advance of the events of November. But on top of that, I would also respond that, yes, I think that, again, the case law in cases like Herman Brothers, Sentinel Hospital, EIS Breitbart, board cases that we say in our brief, the board's decision here is consistent with those precedents, that when a party is suddenly introducing new proposals that are, that had not previously been raised and or that are inconsistent with a radical decision, that there is a divergence from its prior bargaining positions at the last minute, that the further bargaining is required between the parties to see if those changed proposals allow the parties an avenue to reach an agreement and they need to fully exhaust all avenues. And I think it's important here, in your hypothetical, I know that you, Judge Katsas, had spoke about kind of a change in economic issues, but I do think it's really important here that the change at the last minute was both on the economic issues and on a raft of non-economic proposals. And I need to respond to the point that Mr. Dowd made, the contention the party, the company has raised, that this was somehow inadvertent or a mistake. There is no evidence in the record, and I have to stress that the company had the evidentiary burden in this case to prove an impasse. When Mr. Cropper, on behalf of the union, testified, he went through point by point and he pointed out all the changes. Well, I don't know about all the changes. He pointed out several changes in the non-economic proposals between the final offer that was ultimately implemented and the company's earlier tentative agreements on those very same non-economic topics. Then it's the company's turn to put on its evidence, and it put on zero, zero evidence as to why it suddenly introduced these brand new non-economic proposals into the negotiations at the 11th hour. So there is no support for the notion that this was a mistake or inadvertent. And it's also simply incorrect to suggest, as the company has, that there's no evidence that the company implemented. I mean, first of all, it would be the company's burden to prove that it withdrew the proposals and that they were a mistake. It never did that. But on top of that, it stipulated, as we point out in our brief, at appendix page 485, the company stipulated before the board that it implemented all of the terms of its offer, which included both the economic and the non-economic, and that those terms then went into effect on December 1, 2017. I don't have much time left, Your Honors, but if I could quickly address just two more points. The company here did more than just fail to share with the union certain information that it had. It made repeated affirmative misrepresentations to the union during the bargaining regarding purported FPS deadlines and allegedly impending FPS reductions to reimbursement rates. It presented October 31 and November 17 as hard deadlines externally imposed by the FPS when the record shows that that was untrue and when the company knew that that was not true. And then on top of that, it specifically tied the last three alleged deadlines that it asserted, the October 31 deadline, the November 17 deadline, and the November 20 deadline, it tied all of those to the false claim that if those deadlines weren't met, that the FPS would cut the reimbursement rates on December 1, 2017, when the company well knew that the FPS had already committed to continuing the status quo reimbursements through March 31, 2018. And the other point I'd like to make, if I can, very briefly, just in connection with the discussion we were having about the last minute introduction of proposals, I think it's also important to remember that prior to November 17, the company had repeatedly claimed other supposedly final offers and other supposedly hard deadlines. And the parties, of course, continued to bargain and exchange proposals, even after those supposedly final offers and deadlines had come and gone. So the union had no reason to understand that the company's latest claim of a November 17 final offer was any different than those prior claims. Your Honors, I'm over my time, but I would welcome the opportunity to answer any additional questions that the Court may have. I have a question about the part of the remedy that orders the company. I don't have it in front of me. I think I may have. I think I may have confused this NLRB case with one I'm hearing tomorrow. I thought. I will withdraw the question. I started to say that, but I wasn't sure. All right, Judge Edwards, you and I are sitting again tomorrow. All right, Judge Katsas, do you have another question? No, I'm set. Thank you. All right. Then, thank you, Mr. Hickson. Mr. Dowd, why don't you take two minutes? Thank you very much, and I'll try to take less than that. I think that the point that Mr. Hickson was making about misrepresentations is dealt with in our brief, and I don't think I need to reiterate that point. The one thing that I do want to focus on is that the court obviously has issues about what it perceives to be changes in proposals and the like that were done in what the court has talked about being poorly timed. But I urge the court to look at the cases that we've cited at page 32 of our brief, which talks about existing National Labor Relations Board decisions and law and precedent that say that there are three exceptions to the rule that there must be an overall impasse before an employer may implement its last, best, and final offer. I want to reiterate that these are, by law, three exceptions where you don't have to have an overall impasse. One is when the union engages in conduct that's calculated to frustrate agreement or to frustrate impasse. That occurred here because the union insisted on mediation as a way of moving forward, and the company doesn't have an obligation to do it. So that was an action by the union that frustrated agreement. The union did not insist on that as a condition of continued bargaining. They just proposed. They said we really think that would be a good thing to have. They did not say we will not negotiate unless you agree to mediation. I don't think that's accurate. I think that the actual communications by the union, if you look at our citations in our brief, were that they did not intend to change their wage offer. They said we've gone as far as we can with our wage offer. Unless you want to participate in mediation, then we'll talk more. So I do think they conditioned any movement on wages by the company having to agree to mediation. But more importantly, it's the second point. It says when an employer can demonstrate that an impasse on one critical issue precluded agreement, then it was okay to go forward and try to break that impasse through implementation of a last and final proposal. I think that is the key finding here. Yeah, I mean, you do have those three exceptions, and the only one that might work is the second one that you're talking about. The problem you have is you changed the proposal. You can't get around it, and you described it as bad timing, a mistake, et cetera. But the board took it for what it was, and they made findings adverse to you. We're supposed to defer to those findings. You reopened, you put everything back on the table again, and that's exactly what the board said. And the case law supports that. You have no exception around that. The case law supports it. And the board made an adverse finding against you on that. Okay. I understand your position on that, Judge Edgeworth. Okay. Thank you. Thank you very much. Oh, wait. Judge Cassis has a question. Back to that last best offer. I want to make sure I understand your characterization of it. Do you think it is a new and different offer, which just opens up new issues? Or do you think it's better characterized as, I'll just call it for shorthand, purely retrogressive, just takes what was offered before and makes all the terms worse for the union? I would have to look at it. I'm sorry. I did not mean to interrupt you. Go ahead. What's the better characterization? I understand that might be important to me. All right. Like Mr. Hickson, I'd have to say I honestly don't know without looking at the documents and comparing them, which are in the record. I'd have to look at it. I'm sorry. It is your burden. Okay. All right. If there are nothing more questions. Okay. If there are no more questions, then thank you, gentlemen, and your case is submitted.
judges: Henderson, Katsas, Edwards